# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF NEW YORK

JENOLITA BURLEY KIKTA,

                        Plaintiff,

      v.                                 5:15-CV-60
                                               (DNH/ATB)

COMMISSIONER OF SOCIAL SECURITY,

                        Defendant.

HOWARD D. OLINSKY, ESQ., for Plaintiff
GRAHAM MORRISON, Special Asst. U.S. Attorney for Defendant

ANDREW T. BAXTER, U.S. Magistrate Judge

## REPORT-RECOMMENDATION

This matter was referred to me for report and recommendation by the Honorable David N. Hurd, United States District Judge, pursuant to 28 U.S.C. § 636(b) and Local Rule 72.3(d). This case has proceeded in accordance with General Order 18.

## I. PROCEDURAL HISTORY

Plaintiff "protectively filed"[1] an application for disability insurance benefits and Supplemental Security Income (SSI) on November 18, 2009, claiming disability beginning March 31, 2008, resulting from fibromyalgia, dizziness, constant diarrhea, and depression. (Administrative Transcript (T.) 103–09, 110–17, 127-28, 144). Plaintiff's applications were denied initially, and plaintiff requested a hearing. (T. 49-

---

[1] When used in conjunction with an "application" for benefits, the term "protective filing" indicates that a written statement, "such as a letter," has been filed with the Social Security Administration, indicating the claimant's intent to file a claim for benefits. *See* 20 C.F.R. § 404.630. There are various requirements for this written statement. *Id.* If a proper statement is filed, the Social Security Administration will use the date of the written statement as the filing date of the application even if the formal application is not filed until a later date.

57).  Plaintiff appeared and testified at a video hearing before an Administrative Law Judge ("ALJ"), Robert E. Gale, on February 16, 2011.  (T. 23–48).  On June 3, 2011, the ALJ denied plaintiff's claims for benefits.  (T. 7-22).  The ALJ's decision became the final decision of the Commissioner when the Appeals Council denied plaintiff's request for review on August 5, 2011.  (T. 1–4).

On September 28, 2011, plaintiff filed an action in the Northern District of New York, challenging the Commissioner's final decision pursuant to 42 U.S.C. § 405(g). On September 24, 2012, I issued a Report-Recommendation, in which I recommended that the case be remanded to the Commissioner for a proper determination of plaintiff's residual functional capacity ("RFC") and a proper assessment of her credibility. (T. 335-48).  On October 23, 2012, the Honorable David N. Hurd adopted my recommendation in its entirety, and the case was remanded to the Commissioner. (T. 333-34).

On December 17, 2012, the Appeals Council vacated the Commissioner's original decision and remanded the case to an ALJ for further proceedings consistent with the court's order. (T. 351).  The case was heard before ALJ Bruce S. Fein by video conference on May 24, 2013. (T. 297-331).  Plaintiff appeared, represented by counse, and testified on her own behalf.  On October 29, 2013, ALJ Fein issued a decision, finding that plaintiff was not disabled. (T. 274-91).  The ALJ's decision became the final decision of the Commissioner when the Appeals Council denied plaintiff's request for review of the ALJ's decision on November 19, 2014. (T. 257-61).  Plaintiff filed this action on January 19, 2015, challenging the Commissioner's current decision. (Dkt.

No. 1).

## II. GENERALLY APPLICABLE LAW

### A. Disability Standard

To be considered disabled, a plaintiff seeking disability insurance benefits or SSI disability benefits must establish that he is "unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months . . . ." 42 U.S.C. § 1382c(a)(3)(A). In addition, the plaintiff's

> physical or mental impairment or impairments [must be] of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 1382c(a)(3)(B).

The Commissioner uses a five-step process, set forth in 20 C.F.R. sections 404.1520 and 416.920, to evaluate disability insurance and SSI disability claims.

> First, the [Commissioner] considers whether the claimant is currently engaged in substantial gainful activity. If he is not, the [Commissioner] next considers whether the claimant has a "severe impairment" which significantly limits his physical or mental ability to do basic work activities. If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which meets or equals the criteria of an impairment listed in Appendix 1 of the regulations. If the claimant has such an impairment, the [Commissioner ] will consider him disabled without considering

3

vocational factors such as age, education, and work experience . . . .
Assuming the claimant does not have a listed impairment, the fourth
inquiry is whether, despite the claimant's severe impairment, he has the
residual functional capacity to perform his past work. Finally, if the
claimant is unable to perform his past work, the [Commissioner] then
determines whether there is other work which the claimant can perform.

*Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982); *see* 20 C.F.R. §§ 404.1520,

416.920. The plaintiff has the burden of establishing disability at the first four steps.

However, if the plaintiff establishes that her impairment prevents her from performing

her past work, the burden then shifts to the Commissioner to prove the final step. *Id.*

### B.    Scope of Review

In reviewing a final decision of the Commissioner, a court must determine

whether the correct legal standards were applied and whether substantial evidence

supported the decision. *Selian v. Astrue*, 708 F.3d at 417; *Brault v. Soc. Sec. Admin,*

*Comm'r*, 683 F.3d 443, 448 (2d Cir. 2012); 42 U.S.C. § 405(g)). Substantial evidence

is "such relevant evidence as a reasonable mind might accept as adequate to support a

conclusion." *Talavera v. Astrue*, 697 F3d 145, 151 (2d Cir. 2012). It must be "more

than a scintilla" of evidence scattered throughout the administrative record. *Id.*

However, this standard is a very deferential standard of review " – even more so than

the 'clearly erroneous standard.'" *Brault*, 683 F.3d at 448.

"To determine on appeal whether an ALJ's findings are supported by substantial

evidence, a reviewing court considers the whole record, examining the evidence from

both sides, because an analysis of the substantiality of the evidence must also include

that which detracts from its weight." *Williams on behalf of Williams v. Bowen*, 859

F.2d 255, 258 (2d Cir. 1988).  However, a reviewing court may not substitute its interpretation of the administrative record for that of the Commissioner, if the record contains substantial support for the ALJ's decision.  *Id*.  *See also Rutherford v. Schweiker*, 685 F.2d 60, 62 (2d Cir. 1982).

An ALJ is not required to explicitly analyze every piece of conflicting evidence in the record.  *See, e.g., Mongeur v. Heckler*, 722 F.2d 1033, 1040 (2d Cir. 1983); *Miles v. Harris*, 645 F.2d 122, 124 (2d Cir. 1981) (we are unwilling to require an ALJ explicitly to reconcile every conflicting shred of medical testimony).  However, the ALJ cannot "'pick and choose' evidence in the record that supports his conclusions."  *Cruz v. Barnhart*, 343 F. Supp. 2d 218, 224 (S.D.N.Y. 2004); *Fuller v. Astrue*, No. 09-CV-6279, 2010 WL 5072112, at *6 (W.D.N.Y. Dec. 6, 2010).

## III. FACTS

Plaintiff's brief includes a detailed summary of the medical records and the hearing testimony. (Pl.'s Br. at 2-13).  Defendant has incorporated the facts as stated by ALJ Fein in his October 29, 2013 decision. (Def.'s Br. at 1).  This court will incorporate the facts as stated by the ALJ in his opinion, with any exceptions as noted.  Rather than reciting all the medical and testimonial evidence at the outset, the court will discuss the relevant details below, as necessary to address the issues raised by plaintiff.

## IV. ALJ'S DECISION

In his decision, ALJ Fein reviewed the procedural history of this case, including a discussion of my September 24, 2012 recommendation to remand the case to the Commissioner. (T. 274-75).  ALJ Fein noted that at the hearing, he inquired about the

availability of additional records, and the plaintiff's attorney stated that "all available records from Dr. Martyn, Dr. Witchley, and Dr. Mastralia have been requested, obtained, and submitted into evidence . . . ." (T. 275). In addition, ALJ Fein kept the record open after the May 24, 2013 hearing in order to allow plaintiff to submit any later-received evidence. (*Id.*) ALJ Fein stated that, by doing so, he "met any duty imposed by the Regulations to develop the administrative record."[2] (*Id.*)

At Step Two of the disability analysis, ALJ Fein found that plaintiff's fibromyalgia and borderline intellectual functioning were severe impairments. (T. 277). The ALJ also found that plaintiff's complaints of dizziness, diarrhea, gastritis, "back impairment," osteoarthritis, and additional mental impairment, beyond borderline intellectual functioning,[3] were not severe within the meaning of the regulations. (T. 279). At Step Three, the ALJ found that there was no Listing for fibromyalgia, and that the severity of plaintiff's borderline intellectual functioning did not meet or equal the criteria of Section 12.05 (Intellectual Disability) or Section 12.02 (Organic Mental Disorders). (T. 279-81).

The ALJ found that the plaintiff had the RFC to lift and/or carry 20 pounds

---

[2] ALJ Fein also noted that plaintiff previously filed Title II and Title XVI applications on July 8, 2008 which were denied initially, but no ALJ hearing was requested. (T. 275). At the hearing, plaintiff's counsel asked ALJ Fein to reopen the previous applications, but ALJ Fein denied counsel's request, refusing to disturb the prior unfavorable determination, dated October 2, 2008. (*Id.*) Plaintiff does not challenge this denial, nor would she have jurisdiction to do so. The Supreme Court has held that the agency's denial of a motion to reopen a prior benefits application is not the type of "final decision" that confers federal court jurisdiction in a Social Security action. *Califano v. Sanders*, 430 U.S. 99, 107-109 (1977). The only exception to this rule involves challenges that are based on constitutional grounds. *Id.*

[3] Plaintiff has not been diagnosed with any medically determinable psychiatric impairment.

occasionally and 10 pounds frequently; sit for 6 hours in an 8-hour day and stand and/or walk for 6 hours in an 8-hour day. (T. 281). The ALJ found that plaintiff had no postural, communicative, visual or environmental limitations. Although she was limited to "simple tasks," she retained the ability to "(on a sustained basis)," understand, carry out, and remember simple instructions, respond appropriately to supervision, co-workers, and usual work situations, and deal with changes in a routine work setting. (*Id.*)

In making this determination, the ALJ considered all of plaintiff's stated symptoms, finding that although her medically determinable impairments could reasonably be expected to cause "some, but not all of the alleged symptoms," plaintiff's "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible." (T. 281-82). Plaintiff reported very significant symptoms, "stemming from a variety of conditions," but the objective medical evidence did not establish that she had dizziness, constant diarrhea, or any impairment that would cause her bones, hip, or back to "'pop out'" or that would cause her muscles to "'loosen.'" (T. 282). The medical evidence also did not establish that plaintiff had any impairment that would affect her ability to see, hear, or talk. (T. 283). The ALJ extensively discussed the limitations plaintiff attributed to pain, finding that her claims of debilitating pain were not credible. (T. 283-89).[4] The ALJ specified the weight that he gave to the

---

[4] The administrative transcript pages are misnumbered in one instance. The last sentence on (T. 287) continues properly on (T. 289), and the last sentence on (T. 288) properly continues on (T. 290). The court will continue to cite to the page number which appears at the bottom of the page where a statement appears, with the understanding that the sequence of pages is incorrect.

medical records that he considered, distinguished between opinions given by acceptable versus non-acceptable medical sources, and specifically cited to the records which supported his RFC determination. (*Id.*)

At Step Four of the disability analysis, the ALJ found that plaintiff was unable to perform her past relevant work, which required medium exertional ability. (T. 288). To the extent that plaintiff's past relevant work as a cashier involved "light" work, the skill level was too high for her present capabilities.[5] However, even though plaintiff could not perform the "full range of light work," the ALJ found at Step Five of the disability analysis that plaintiff could perform other jobs that exist in significant numbers in the national economy. (T. 288, 290). The ALJ noted that if plaintiff had the RFC to perform a full-range of light work, the Medical Vocational Guidelines would dictate a fining of "not disabled" based on her age, education, and prior work experience. (T. 290). The ALJ also determined that even though the plaintiff was limited to simple tasks, and could not perform the full-range of light work, no vocational testimony was needed because Social Security Ruling ("SSR") 85-15 provides that as long as the individual can perform the basic mental demands of competitive, remunerative, unskilled, work, she will be found to be "'not disabled.'" (*Id.*) Because plaintiff retained the ability to perform unskilled work, her additional limitations "have little or no effect on the occupational base of unskilled light work," so the ALJ concluded that

---

[5] ALJ Fein found that plaintiff was limited to "unskilled work," based on her intellectual limitations. (T. 289). Plaintiff's work as a head cashier at Big Lots was "skilled" work, and the position of "cashier checker" is listed by the Dictionary of Occupational Titles ("DOT") as "semi-skilled." (*Id.*) The previous ALJ found that plaintiff could perform her past relevant skilled/semiskilled work. (T. 15-16, 17).

plaintiff was not disabled.

## V.  ISSUES IN CONTENTION

Plaintiff raises the following arguments:

> 1.  The ALJ's RFC determination is not supported by substantial evidence due to his failure to properly weigh the medical opinion evidence. (Pl.'s Br. at 15-20) (Dkt. No. 11).
>
> 2.  The ALJ failed to properly assess plaintiff's credibility. (Pl.'s Br. at 20-21).
>
> 3.  The ALJ erred in failing to obtain the testimony of a VE. (Pl.'s Br. at 22).

Defendant argues that the Commissioner's determination was supported by substantial evidence and should be affirmed. (Dkt. No. 14). For the following reasons, this court agrees with defendant and will recommend dismissal of the complaint.

## VI.  RFC/TREATING PHYSICIAN/WEIGHT OF THE EVIDENCE

### A.  Legal Standards

#### 1.  RFC

RFC is "what [the] individual can still do despite his or her limitations. Ordinarily, RFC is the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis. . . ." A "regular and continuing basis" means eight hours a day, for five days a week, or an equivalent work schedule. *Balles v. Astrue*, No. 3:11-CV-1386 (MAD), 2013 WL 252970, at *2 (N.D.N.Y. Jan. 23, 2013) (citing *Melville v. Apfel*, 198 F.3d 45, 52 (2d Cir. 1999) (quoting SSR 96–8p, 1996 WL 374184, at *2)).

In rendering an RFC determination, the ALJ must consider objective medical facts, diagnoses and medical opinions based on such facts, as well as a plaintiff's subjective symptoms, including pain and descriptions of other limitations. 20 C.F.R §§ 404.1545, 416.945. *See Martone v. Apfel*, 70 F. Supp. 2d 145, 150 (N.D.N.Y. 1999) (citing *LaPorta v. Bowen*, 737 F. Supp. 180, 183 (N.D.N.Y. 1990)). An ALJ must specify the functions plaintiff is capable of performing, and may not simply make conclusory statements regarding a plaintiff's capacities. *Martone v. Apfel*, 70 F. Supp. 2d at 150 (citing *Ferraris v. Heckler*, 728 F.2d 582, 588 (2d Cir. 1984); *LaPorta v. Bowen*, 737 F. Supp. at 183; *Sullivan v. Secretary of HHS*, 666 F. Supp. 456, 460 (W.D.N.Y. 1987)). The RFC assessment must also include a narrative discussion, describing how the evidence supports the ALJ's conclusions, citing specific medical facts, and non-medical evidence. *Trail v. Astrue*, No. 5:09-CV-1120, 2010 WL 3825629 at *6 (N.D.N.Y. Aug. 17, 2010) (citing Social Security Ruling ("SSR") 96-8p, 1996 WL 374184, at *7).

### 2.    Treating Physician

While a treating physician's opinion is not binding on the Commissioner, the opinion must be given controlling weight when it is well supported by medical findings and not inconsistent with other substantial evidence. *See Veino v. Barnhart*, 312 F.3d 578, 588 (2d Cir. 2002); 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2). If the treating physician's opinion is contradicted by other substantial evidence, the ALJ is **not** required to give the opinion controlling weight. *Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004). The ALJ must, however, properly analyze the reasons that a report of a

treating physician is rejected. *Id.* An ALJ may not arbitrarily substitute his/her own judgment for competent medical opinion. *Rosa v. Callahan*, 168 F.3d 72, 79 (2d Cir. 1999).

### 3. Weight of the Evidence

In making his determination, the ALJ weighs all the evidence of record and carefully considers medical source opinions about any issue. SSR 96-5p, 1996 WL 374183, at *2-3 (1996). Under 20 C.F.R. §§ 404.1527(e) and 416.927(e), some issues are not "medical issues," but are "administrative findings." The responsibility for determining these issues belongs to the Commissioner. SSR 96-5p, 1996 WL 374183, at *2. These issues include whether the plaintiff's impairments meet or equal a listed impairment; the plaintiff's RFC; how the vocational factors apply; and whether the plaintiff is "disabled" under the Act. *Id.* In evaluating medical opinions on issues that are reserved to the Commissioner, the ALJ must apply the factors listed in 20 C.F.R. §§ 404.1527(d) and 416.927(d). The ALJ must clearly state the legal rules that he applies and the weight that he accords the evidence considered. *Drysdale v. Colvin*, No. 14-CV-722, 2015 WL 3776382, at *2 (S.D.N.Y. June 16, 2015) (citing *Rivera v. Astrue*, No. 10 Civ. 4324, 2012 WL 3614323, at *8 (E.D.N.Y. Aug. 21, 2012) (citation omitted)).

### B. Application

Plaintiff argues that the ALJ's RFC determination was not supported by substantial evidence because he failed to give treating physician, Dr. Martin Morell's Medical Source Statement the appropriate weight and failed to properly analyze the

plaintiff's credibility.

Dr. Martin Morell, a Board-Certified Rheumatologist, began seeing the plaintiff in January of 2013 at the request of plaintiff's new treating internist, Carmine Mastrolia.[6] (T. 427-28). Plaintiff testified at the 2013 hearing that she only sees Dr. Morell for her fibromyalgia. (T. 319). Dr. Morell submitted a Medical Source Statement, dated May 10, 2013 in which he found that plaintiff would only be able to sit for fifteen minutes at a time before having to change positions; would only be able to stand for thirty minutes at a time before needing to sit down; and could only stand and/or walk for a total of less than two hours in an eight-hour day. (T. 454). Dr. Morell also indicated that plaintiff could lift and carry less than ten pounds frequently; ten pounds occasionally; and twenty pounds rarely. (T. 455).

He also found that plaintiff could frequently look down, sustaining head flexion and turn her head right or left. She could also look up and hold her head in a static position. (*Id.*) He found that plaintiff could occasionally twist; stoop/bend; crouch/squat; climb ladders; and climb stairs. (*Id.*) She could frequently use her hands for grasping, turning, and twisting objects in addition to frequently using her fingers for fine manipulation, and her arms for reaching overhead. (*Id.*) Dr. Morell estimated that

---

[6] The transcript of the administrative hearing refers to Dr. Mastrolia as "Dr. Bushrolea." (*See e.g.* T. 312). Because there are no records from anyone narmed Dr. Bushrolia in the administrative transcript, the court assumes that the ALJ was referring to Dr. Mastrolia. Dr. Mastrolia's notes begin on February 28, 2011, and it appears that he was plaintiff's newer primary care physician. (T. 319, 426-39). Prior to Dr. Mastrolia, plaintiff's treating primary care physician was Dr. Rathika Martyn, M.D. from Oneida Health Care Center. (T. 182-96, 401-21). At the 2013 hearing, plaintiff testified that she stopped seeing Dr. Martyn in 2010, after plaintiff lost her medical insurance, because Dr. Martyn did not accept Medicaid. (T. 320).

plaintiff would have "good and bad" days and would be "off-task" for ten percent of the work day. (T. 456).

Dr. Morell's Medical Source Statement also stated his diagnosis of fibromyalgia and indicated that plaintiff's symptoms included multiple tender points, non-restorative sleep, chronic fatigue, morning stiffness, muscle weakness, irritable bowel syndrome, frequent and severe headaches, and numbness and tingling. (T. 453). Dr. Morell indicated that plaintiff had pain throughout her spine; chest; shoulders; arms; hands/fingers; hips; legs; and knees/ankles/feet. (T. 454). Changing weather, stress, fatigue, movement, and overuse would precipitate plaintiff's pain. (*Id.*)

The ALJ gave Dr. Morell's Medical Source Statement "little evidentiary weight." (T. 289). Plaintiff argues that the ALJ gave Dr. Morell's findings little weight "because he did not begin treating plaintiff until January 2013," but that he failed to assess the doctor's findings based upon the record "as a whole." (Pl.'s Br. at 17). The plaintiff also argues that the ALJ's conclusion that Dr. Morell's opinion was not supported by the record is contradicted by the evidence. (*Id.*)

In his opinion, the ALJ stated that he gave Dr. Morell's opinion little weight "for several reasons," only the first of which was that Dr. Morell began treating plaintiff in January of 2013, while plaintiff is seeking disability beginning in 2008. The regulations specifically provide that the length of the treating relationship and the frequency of examination are factors to be considered in analyzing a treating physician's report or opinion. 20 C.F.R. § 404.1527(c)(2)(i). The regulations explain that "the longer a treating source has treated you and the more times you have been

seen by a treating source, the more weight we will give to the sources medical opinion." (*Id.*) Thus, the fact that Dr. Morell only began treating plaintiff in 2013 is a valid consideration under the regulations.[7]

In any event, the ALJ did not rely only on the short-term nature of Dr. Morell's treatment. The ALJ also noted that the only clinical findings documented by Dr. Morell were the "tenderpoints" used to diagnose fibromyalgia, and that there was no indication that plaintiff had "limited range of motion, aside from a slight decrease in lateral rotation of her neck and minimal decrease in internal rotation of her right shoulder." (T. 289) (citing Exh. 15F, p.7 – T. 446). The ALJ stated that there was no documentation of swelling, muscle atrophy, sensory deficits, strength deficits, or neurological deficits in Dr. Morell's office notes, and that "contrary to [Dr. Morell's] report of the claimant's muscle weakness . . . , his treatment notes indicate that the claimant denied motor weakness." (T. 289) (citing T. 445).

The ALJ's determination is supported by substantial evidence. Dr. Morell only examined the plaintiff three times, and the record contains only one narrative report by Dr. Morell. (T. 427-28). The narrative report is a letter that Dr. Morell wrote to Dr. Mastrolia describing Dr. Morell's first examination of plaintiff. (*Id.*) Dr. Morell's other reports consist of form-reports in which blanks are checked next to a list of pre-printed symptoms, trigger point locations, and diagnoses. (T. 441-44). In Dr. Morell's letter to

---

[7] In addition, it does not appear that Dr. Morell was making any retrospective evaluation of plaintiff's RFC or her condition. *See e.g. Roy v. Apfel*, No. 99-6153, 1999 WL 1295361, at *3 (2d Cir. Dec. 22, 1999) (retrospective opinion of treating physician may in certain circumstances be given controlling weight) (unpublished opinion).

Dr. Mastrolia, Dr. Morell stated that plaintiff's neck had a "slight decrease in lateral rotation, bilaterally," and her right shoulder had only a "minimal decrease in internal rotation." (T. 446). Although there was tenderness over the right trochanter,[8] plaintiff had "adequate range of motion in her hips, she had normal flexion and extension of her knees, no effusion in her ankles, and only diffuse tenderness over her upper mid low back, "bicep, tricep, forearm, thighs and calf." (T. 428). A review of Dr. Morell's examination forms dated February 25 and April 15, 2013, shows no notations in the spaces reserved for "ROM." (T. 441, 443). Thus, Dr. Morell, himself, did not find a substantial decrease in plaintiff's range of motion.[9] Finally, in his letter, Dr. Morell stated that plaintiff "denie[d] . . . motor weakness." (T. 445). Thus, Dr. Morell's letter is not consistent with the very restrictive Medical Source Statement that he submitted in May of 2013, after having seen the plaintiff only three times.

There is substantial evidence in the record showing that plaintiff's range of motion is not significantly limited. On August 4, 2009, Dr. Martyn (plaintiff's former treating physician) noted that, notwithstanding plaintiff's bilateral paired tender points,

---

[8] A trochanter is one of the bony protuberances near the proximal end of the femur. http://medical-dictionary.thefreedictionary.com/trochanter (citing Farlex Partner Medical Dictionary (Farlex 2012)).

[9] In the brief, plaintiff argues that the ALJ erroneously found that there was no indication that plaintiff had a "limited range of motion, aside from a slight decrease in lateral rotation of her neck, and minimal decrease in internal rotation of her right shoulder." (Pl.'s Br. at 18). The ALJ was citing Dr. Morell's letter when the ALJ made that statement. (T. 289, 428). Additionally, the plaintiff cites to (T. 427-28 and 477-78) in his argument that Dr. Morell found a decreased range of motion. (Pl's Br. at 18). However, (T. 477-78) is not a report by Dr. Morell. It is an occupational therapy evaluation by Rachael Givens. (T. 478). There may have been some confusion because the top of the first page of the report states that Dr. Morell is the plaintiff's physician, not that the report was written by Dr. Morell. In any event as discussed herein, there is substantial evidence in the record that plaintiff's range of motion is not substantially limited.

plaintiff had "[g]ood range of motion of the wrists, elbows, shoulders, hips, knees, and ankles." (T. 402). On the same day, Dr. Martyn encouraged the plaintiff to exercise more. (T. 402). Even when Dr. Martyn reported that plaintiff's grip strength was poor in October of 2008, she also stated that plaintiff had "fairly good" range of motion of her shoulders, elbows, and wrists. (T. 407).

On February 1, 2010, consulting physician Roberto Rivera, M.D. found that, although plaintiff had a pained look on her face, her gait was normal, she could walk on heels and toes without difficulty, and her squat was "full." (T. 203-204). Her cervical and lumbar spine showed "full flexion, extension, lateral flexion bilaterally, and full rotary movement bilaterally." (T. 204). Straight leg raising was negative bilaterally. (*Id.*) She had a full range of motion in her shoulders, elbows, forearms, wrists, hips, knees, and ankles bilaterally. She had full 5/5 strength in her upper and lower extremities. Dr. Rivera noted that "[f]or all these maneuvers incidentally, she complains of pain and she moans and groans, but she does them perfectly." (*Id.*) Hand and finger dexterity were "intact," and plaintiff's grip strength was 5/5 bilaterally. (T. 205).

Plaintiff argues that the record is "replete" with examination findings regarding plaintiff's diminished range of motion, and that, as a result of plaintiff's documented limitations on her range of motion, Dr. Martyn kept her our of work "indefinitely" as early as April 17, 2008. (Pl.'s Br. at 18). However, when Dr. Martyn made that statement, she was referring to plaintiff's former work, which required medium exertional ability. (T. 288, 411). Dr. Martyn specifically stated that "[plaintiff] is

16

unable to return to her work due to discomfort.  She cannot sit for prolonged periods of time, carry objects, push or pull for a prolonged period of time.  Therefore, I will keep her out of work indefinitely." (*Id.*)  On June 24, 2008, Dr. Martyn stated that "[plaintiff] has not been able to go back to work since her work involves lifting." (T. 410).  In any event, the fact that plaintiff may have some limited range of motion does not support Dr. Morell's extremely restrictive Medical Source RFC, and the ALJ was justified in giving it little weight.

Plaintiff also argues that the ALJ erred in relying on the RFC assessment of a Single Decision Maker ("SDM").  The court notes that the ALJ specifically stated that he was not giving the SDM any evidentiary weight. (T. 287).  Plaintiff argues that notwithstanding this statement by the ALJ, he implicitly relied on the SDM's RFC because the SDM also found that plaintiff could perform light work, and the ALJ's RFC "virtually mirrors" the analyst's decision. (Pl.'s Br. at 19-20).

The fact that the ALJ found that plaintiff could perform light work by properly analyzing the medical evidence of record is not tainted simply because the SDM also found that plaintiff could perform light work.  In making his RFC determination the ALJ gave "some weight" to consultative physician, Dr. Rivera, who found that plaintiff had "no limitation for sitting, standing, or walking. (T. 205).  With respect to lifting, carrying, pushing, or pulling, the ALJ cited Dr. Rivera, who stated that plaintiff had "no physical limitations . . . other than the pain she experiences." (T. 286) (citing T. 205).  The ALJ carefully discussed Dr. Rivera's clinical findings, and then took plaintiff's pain into account when the ALJ limited the plaintiff to light work.  The ALJ

specifically stated that "[w]hile there is [sic] no objective findings suggesting that the claimant has limitations for lifting, carrying, pushing, or pulling, I find that the claimant is limited to lifting, carrying , pushing, and pulling 20 pounds occasionally and ten pounds frequently ***due to her complaints of pain***." (T. 286) (emphasis added).

This discussion by the ALJ shows that he took Dr. Rivera's statements about plaintiff's abilities and about her pain into consideration when he made the RFC determination. Although an "ALJ cannot arbitrarily substitute his own judgment for a competent medical opinion,"[10] there is no requirement that the ALJ pick one RFC and use that particular evaluation in its entirety. *See Matta v. Astrue*, 508 F. App'x. 53, 56 (2d Cir. 2013) (although ALJ's conclusion did not perfectly correspond with any of the opinions of medical sources, ALJ was entitled to weigh all of the evidence available to make an RFC finding that was consistent with the record as a whole). There is no requirement that the ALJ accept every limitation in the opinion of a consultative examiner. *See Pellam v. Astrue*, 508 F. App'x 87, 89 (2d Cir. 2013) (ALJ properly declined to credit certain conclusions in CE's opinion that were inconsistent with other evidence of record); *Cruz v. Colvin*, 2014 WL 4826684, *14 (N.D.N.Y. Sept. 29, 2014) (ALJ may credit some portion of a consultative opinion, while properly declining to credit those conclusions that are not supported by CE's own examination findings and inconsistent with other evidence of record).

Thus, in this case, the ALJ could give "some" weight to Dr. Rivera's opinion that

---

[10] *Rosa v. Callahan,* 168 F.3d at 79 (citing *McBrayer v. Sec'y of Health and Human Servs.*, 712 F.2d 795, 799 (2d Cir. 1983)).

plaintiff had few limitations, while taking into consideration the doctor's comment about plaintiff's pain, and further limiting plaintiff's RFC accordingly. As stated above, the ALJ gave Dr. Morell's very restrictive RFC little evidentiary weight. The ALJ stated that in May of 2008, Dr. Martyn found that plaintiff could not return to her medium work due to discomfort and due to an inability to sit for prolonged periods or to carry, push, or pull for prolonged periods, but the ALJ also gave this opinion little weight. (T. 288, 289). The ALJ noted that although Dr. Martyn was concerned that plaintiff had cervical disc disease, she stated this opinion prior to plaintiff's MRI.[11] (T. 289). Prior x-rays of plaintiff's cervical spine were negative,[12] and the subsequent MRI showed only "tiny" disc bulges. (*Id.*) (*See* T. 418-19). The ALJ determined that the results of the MRI ruled out any cervical disc disease that would have been expected to cause the limitations expressed in Dr. Martyn's 2008 report. (*Id.*) In addition, plaintiff stopped seeing Dr. Martyn in 2009, and the ALJ noted that plaintiff told a consultative examiner in 2010 that she was still looking for a new primary care provider. (*Id.*)

In June of 2013, plaintiff's new chiropractor, Dr. Mish cited to "recent spinal x-rays" from April of 2012, which showed "early osteophyte formation" at C4-C7 and T4-T8, with "mild to moderate degenerative disc disease" at L1-L2 and L2-L3, together with cervical and lumbar lordosis and sublaxation at C1, C3-C7, T3-T9, L1-L2, and L5 to the sacrum. (T. 502). However, after giving plaintiff's counsel ample opportunity to

---

[11] Dr. Martyn's report was dated May 2, 2008 (T. 411), but the MRI was not performed until May 7, 2008 (T. 418). X-rays of the cervical spine taken on April 17, 2008 were "negative." (T. 419)

[12] X-rays of the cervical spine were taken on April 17, 2008. (T. 419).

complete the record, the ALJ correctly found that there were no such documents in the record. In any event, the chiropractor was not an acceptable medical source for the "diagnosis" of plaintiff's condition. (T. 285). The lack of documents in the record supporting these "new" findings is important since the x-ray and MRI reports that do appear in the record show no such results. 20 C.F.R. §§ 404.1513(a) (acceptable medical sources), (d) ("other" sources including chiropractors);[13] 416.913(a), (d). On August 23, 2009, x-rays of plaintiff's lumbosacral spine showed "lumbar straightening without fracture, subluxation, or significant degenerative disc disease." (T. 415). As stated above, the May 7, 2008 MRI of plaintiff's cervical spine showed "only tiny disc bulges from C4-5 through C6-7 without disc herniation or significant spinal canal or neuroforaminal narrowing to cause neural impingement." (T. 418). X-rays of both the right shoulder and the cervical spine were "unremarkable" for the right shoulder and "negative" for the cervical spine. (T. 419).

Plaintiff argues that Dr. Morell's restrictive RFC evaluation is supported by an April 30, 2013 Functional Capacity Evaluation ("FCE"), written by Michele Enos, an occupational therapist ("OT"), who performed a one-time evaluation and found that plaintiff was limited to "occasional" lifting of up to five pounds, "infrequent" pushing or pulling of up to four pounds, "occasional" sitting, standing, walking, and reaching forward, and "infrequent" reaching over head. (Pl.'s Br. at 18) (citing T. 481-99). Ms.

---

[13] The regulations provide that only "acceptable medical sources" may "establish" an impairment, while evidence from "other" sources such as chiropractors *may* be considered to show the severity of the impairment and how it affects the individual's ability to work. 20 C.F.R. §§ 404.1513(a), (d); 416.913(a), (d).

Enos also limited plaintiff to operating "light" arm and/or leg controls. (T. 483). Ms. Enos found that the FCE results were "valid," and that plaintiff made excellent effort during the evaluation. (T. 482).

The ALJ gave Ms. Enos's evaluation "little evidentiary weight." (T. 287). The ALJ discounted this opinion, first, because Ms. Enos was not an acceptable medical source, and second, because she had no treatment relationship with the plaintiff, having only seen the plaintiff once for the specific purpose of the FCE. (*Id.*) The ALJ also stated that the objective medical evidence did not support this evaluation. (*Id.*) While the opinion of a source who is not an acceptable medical source may be considered by the ALJ in determining the severity of or limitations imposed by plaintiff's impairments,[14] the ALJ analysis in this case is supported by substantial evidence.

As stated above, the record contains various reports, written by OT Rachael Givens.[15] (T. 466-78). On April 4, 2013, less than 30 days prior to Ms. Enos's evaluation, Ms. Givens discharged plaintiff from the Sitrin Medical Rehabilitation Center, after plaintiff completed a course of occupational therapy. (T. 467). In her discharge report, Ms. Givens stated that plaintiff's pain level on April 4, 2013 was "a 5 with achyness reported through the back and neck." (*Id.*) Plaintiff reported performing all her exercises "to date" and "feels better as a result." The plaintiff then "independently performed" upper body and lower body stretches, using the "red theraband, displaying normal endurance for 2 sets of 10 reps-shoulder press, shoulder

---

[14] 20 C.F.R. §§ 404.1513(a), (d); 416.913(a), (d).

[15] The ALJ did not specifically mention OT Givens's reports.

flexion, shoulder abduction, bicep curl, hip flexion abduction/adduction and ankle dorsiflexion/plantar flexion." (*Id.*) The plaintiff "completed all exercises with no noted increase in pain." (*Id.*) This report is very different than OT Enos's FCE in which plaintiff claimed pain of 10/10+ during the entire evaluation. The ALJ's rejection of Ms. Enos's FCE as support for Dr. Morell's findings was supported by substantial evidence in the record.

Thus, the ALJ gave the medical records the appropriate weight and carefully considered the evidence in determining that plaintiff had the RFC to perform light work.

## VII.  **CREDIBILITY**

### A.  **Legal Standards**

"An [ALJ] may properly reject [subjective complaints] after weighing the objective medical evidence in the record, the claimant's demeanor, and other indicia of credibility, but must set forth his or her reasons 'with sufficient specificity to enable us to decide whether the determination is supported by substantial evidence.'" *Lewis v. Apfel*, 62 F. Supp. 2d 648, 651 (N.D.N.Y. 1999) (quoting *Gallardo v. Apfel*, No. 96 CIV 9435, 1999 WL 185253, at *5 (S.D.N.Y. March 25, 1999)). To satisfy the substantial evidence rule, the ALJ's credibility assessment must be based on a two-step analysis of pertinent evidence in the record. *See* 20 C.F.R. § 416.929; *see also Foster v. Callahan*, No. 96-CV-1858, 1998 WL 106231, at *5 (N.D.N.Y. Mar. 3, 1998).

First, the ALJ must determine, based upon the claimant's objective medical evidence, whether the medical impairments "could reasonably be expected to produce

the pain or other symptoms alleged . . . ." 20 C.F.R. § 416.929(a). Second, if the medical evidence alone establishes the existence of such impairments, then the ALJ need only evaluate the intensity, persistence, and limiting effects of a claimant's symptoms to determine the extent to which it limits the claimant's capacity to function. 20 C.F.R. § 416.929(c). When the objective evidence alone does not substantiate the intensity, persistence, or limiting effects of the claimant's symptoms, the ALJ must assess the credibility of the claimant's subjective complaints by considering the record in light of the following symptom-related factors: (1) claimant's daily activities; (2) location, duration, frequency, and intensity of claimant's symptoms; (3) precipitating and aggravating factors; (4) type, dosage, effectiveness, and side effects of any medication taken to relieve symptoms; (5) other treatment received to relieve symptoms; (6) any measures taken by the claimant to relieve symptoms; and (7) any other factors concerning claimant's functional limitations and restrictions due to symptoms. 20 C.F.R. § 416.929(c)(3).

### B. Application

Plaintiff argues that the ALJ erred in basing his rejection of plaintiff's credibility on the "diagnostic images of record."[16] (Pl.'s Br. at 21). Plaintiff argues that the Social Security Rulings ("SSRs") specifically provide that because symptoms such as pain often indicate that an impairment is more severe than is shown by objective evidence, the ALJ must carefully consider the individual's statements in addition to the "rest of

---

[16] Plaintiff specifically refers to the difference between the 2008-2009 x-rays and MRI reports with those allegedly taken in 2012 and mentioned by chiropractor Dr. Mish. (Pl.'s Br. at 21). Plaintiff argues that the new x-rays show greater impairment than the originals.

the relevant evidence." (*Id.*) The ALJ did exactly what was required by SSR 96-7p in finding that plaintiff's complaints of pain and limiting symptoms were "not entirely credible." (T. 281-89)

It is true that the ALJ relied upon the 2008-2009 x-ray and MRI reports which showed very mild, if any, impairment. (T. 283). The ALJ noted that x-rays of plaintiff's right shoulder and lumbar spine taken in 2010 were also negative. (T. 283). The ALJ did mention the chiropractor's reference to the 2012 x-rays, but as stated above, those documents were not in the administrative record, and the chiropractor was not an acceptable medical source to diagnose an impairment. (T. 285).

The ALJ discussed plaintiff's treatment history in determining that she was less than credible. (T. 283). The ALJ stated that plaintiff began going to physical therapy a few months after her March 2008 fall, but discontinued the therapy in July of 2008. (T. 293). The ALJ stated that plaintiff had good range of motion during her 2009 physical examination, after which she was told to exercise more because she was "slacking off." (T. 284) (citing T. 401).

At the hearing, plaintiff claimed that her medication, Lyrica, caused dizziness, but did not report dizziness to the doctor who prescribed the medication, and instead stated that Lyrica was working for her. (T. 283, 403). In fact, Dr. Martyn's notes state that plaintiff failed to keep an appointment with a physician in the pain clinic because the Lyrica was working for her, and she wanted to "hold off." (T. 401, 403). When she began seeing Dr. Morell, she told him that Lyrica had caused some weight gain, but never mentioned dizziness according Dr. Morell's notes. (T. 445).

The ALJ noted that plaintiff saw a chiropractor "intermittently," and that after she stopped seeing her first chiropractor, Dr. Gary Witchley, she did not seek chiropractic treatment for two years, suggesting "that her pain was not as bothersome as she alleges." (T. 284). The regulations provide that the ALJ may consider "any measures taken to relieve symptoms" as well as "other treatment received to relieve symptoms." 20 C.F.R. § 416.929(c)(3). The court notes that Dr. Witchley's treatment notes from 2010-2011 support the ALJ's findings. (T. 422-24). Dr. Witchley stated that, although plaintiff was having "some" back pain, she always felt better after the treatments. (T. 422). On February 21, 2011, plaintiff stated that she hurt from head to toe, but she had slipped and fallen on some ice earlier that morning, and on February 23, 2011, Dr. Witchley stated that "she felt much better after her last treatment," and "she felt better after treatment today." (T. 423). Thus, while plaintiff did feel a degree of discomfort, she seemed to be obtaining a degree of relief from the chiropractic treatments.

On June 16, 2011, Dr. Witchley stated that plaintiff reported "some lower back discomfort for the past two days," but she had been "riding around a lot in the truck, drove to PA to get married and honeymoon . . . just got back last night." (T. 423). Plaintiff's ability to ride around "a lot" in a truck, drive to Pennsylvania, get married, and go on a honeymoon belies her claims that she could only walk 20 feet, lift only five pounds, and sometimes could not even get out of bed. Plaintiff began seeing Dr. Mish in 2013, and notwithstanding Dr. Mish's lengthy statement of plaintiff's impairments, his June 4, 2013 report states that plaintiff presented with a "subacute" condition, that

"in general," plaintiff's condition was improving, and her "response to care has been good." (T. 502).

Plaintiff argues that the ALJ failed to consider the observations of state agency interviewer M. Peck because SSR 96-7p provides that the ALJ must consider "any observations about the individual recorded by SSA employees during interviews, whether in person or by telephone." (Pl.'s Br. at 21). Plaintiff argues that "notably," M. Peck documented that plaintiff had difficulty breathing, concentrating, talking, and answering, and she "sounded" very depressed. (Pl.'s Br. at 21) (citing T. 129). The court would first point out that there is absolutely no indication of any qualifications of M. Peck to make any medical assessment of the plaintiff, and the report indicates that the interview was conducted by telephone. (T. 129). Plaintiff does not allege problems breathing, talking, or answering questions. She had no problems at the hearing doing any of those activities. M. Peck's assessment consists of a list of such activities with either a "yes" or a "no" after the activity. There is no explanation of what M. Peck intended or heard when he was making this "assessment." The fact that the ALJ did not mention these vague observations which occurred once during a telephone interview is not "harmful" error in his credibility determination.

The ALJ discussed many aspects of plaintiff's credibility, including the inconsistency between the objective evidence and her complaints of pain, her inconsistent statements regarding her medication, the consultative physician questioning her complaints of pain, and her daily activities. "An ALJ is not required to discuss in depth every piece of evidence contained in the record, so long [as] the

evidence of record permits the Court to glean the rationale of an ALJ's decision." *LaRock ex. rel. M.K. v. Astrue*, No. 10–CV–1019, 2011 WL 1882292, *7 (N.D.N.Y. Apr. 29, 2011) (citing *Mongeur v. Heckler*, 722 F.2d 1033, 1040 (2d Cir.1983) (internal quotation marks omitted)).

While it is true that SSR 96-7p states that an ALJ should consider any observations of SSA interviewers, "[t]he ALJ must do so in the context of his overall evaluation of the credibility of the individual's statements and 'based on a consideration of all the evidence in the case record,' rather than basing his conclusions on personal observations alone." *Wright v. Colvin*, No. 5:12-CV-0440 MAD/VEB, 2013 WL 3777187, at *6, 8 (N.D.N.Y. July 17, 2013) (citing *Campbell v. Astrue*, No. 2:11-CV-338, 2012 WL 5178024, at *12 (N.D. Ind. Oct. 17, 2012); SSR 96–7p). "A single and unsubstantial omission by the ALJ of lay observations that are not objective in nature, but rather described external behavior within the control of plaintiff, does not necessitate remand." *Id.* (citing *Miles v. Astrue*, No. 05-5892, 2007 WL 764037, at *3 (E.D. Pa. Mar. 9, 2007). In addition, when the medical evidence contradicts those "observations, it is "not reasonable to conclude that such lay comments would have persuaded the ALJ or any other adjudicator." *Id.* (citing *Wier v. Astrue*, 2008 WL 5046420, at *7–8 (W.D. Okla. 2008)).

In this case, even if the court could consider that the ALJ's failure to mention M. Peck's "observations" was error, it was harmless. Even though the ALJ did not mention M. Peck, in his decision, the ALJ stated that the evidence did not establish that plaintiff had any impairments that would affect her ability to see, hear, or ***talk***. (T. 282)

(emphasis added). M. Peck's statements about plaintiff's difficulty breathing, concentrating, or speaking described external behavior under plaintiff's control, did not reflect on any of plaintiff's exertional abilities, and would not have changed the ALJ's finding regarding plaintiff's credibility, given all the other evidence in the record that he cited to support his finding.[17]   In addition, the ALJ had the opportunity several years later to observe the plaintiff during the hearing and would certainly have credited his own observations of plaintiff rather than the observations of a lay individual who only spoke to the plaintiff over the telephone for an undocumented period of time.  There is no basis to remand on this issue.

## IX.   GRIDS/VOCATIONAL EXPERT

### A.   Legal Standards

Once the plaintiff shows that she cannot return to her previous work, the Commissioner bears the burden of establishing that the plaintiff retains the RFC to perform alternative substantial gainful work in the national economy.  *Butts v. Barnhart*, 388 F.3d 377, 383 (2d Cir. 2004).  In the ordinary case, the ALJ carries out this fifth step of the sequential disability analysis by applying the applicable Medical-Vocational Guidelines ("the Grids").  *Id.*  The Grids divide work into sedentary, light,

---

[17] These lay observations are in direct conflict with the February 1, 2010 consultative report of Dr. Kristen Barry, Ph.D. (T. 197-201).  Dr. Barry found that plaintiff's speech was "fluent and clear," and she had "adequate expressive and receptive language skills." (T. 198).  Her thought processes were coherent and goal-oriented with no evidence of hallucinations, delusions, or paranoia.  Her affect was of "full range and appropriate to her speech and thought content."  Although plaintiff was frustrated, she did not appear overly anxious or depressed.  Her attention and concentration were "intact," and her memory skills were intact.  Her cognitive functioning was in the borderline range, but her general fund of information was appropriate to her experience. (T. 199).  Such a detailed medical source description of plaintiff's condition would certainly be of greater impact than the observations of a lay interviewer.

medium, heavy, and very heavy categories, based on the extent of a claimant's ability to sit, stand, walk, lift, carry, push, and pull. 20 C.F.R. Pt. 404, Subpt. P, App. 2; *Zorilla v. Chater*, 915 F. Supp. 662, 667 n.2 (S.D.N.Y. 1996). *See also* 20 C.F.R. §§ 404.1567 & 416.967. Each exertional category of work has its own Grid, which then takes into account the plaintiff's age, education, and previous work experience. *Id.* Based on these factors, the Grids help the ALJ determine whether plaintiff can engage in any other substantial work that exists in the national economy. *Id.*

"Although the grids are 'generally dispositive, exclusive reliance on [them] is inappropriate' when they do not fully account for the claimant's limitations." *Martin v. Astrue*, 337 F. App'x 87, 90 (2d Cir. 2009) (citation omitted). When significant nonexertional impairments[18] are present or when exertional impairments do not fit squarely within Grid categories, the testimony of a vocational expert is required to support a finding of residual functional capacity for substantial gainful activity. *McConnell v. Astrue*, 6:03-CV-0521 (TJM), 2008 WL 833968, at *21 (N.D.N.Y. Mar. 27, 2008) (citing, *inter alia*, *Bapp v. Bowen*, 802 F.2d 601, 605 (2d Cir. 1986).

"If a claimant has nonexertional limitations that 'significantly limit the range of work permitted by his exertional limitations,' the ALJ is required to consult with a vocational expert[,]" rather than relying solely on the Grids. *Zabala v. Astrue*, 595 F.3d 402, 410 (2d Cir. 2010) (*citing Bapp v. Bowen*, 802 F.2d 601, 605 (2d Cir. 1986)). The mere existence of a nonexertional impairment does not automatically require

---

[18] A "nonexertional" limitation is a limitation or restriction imposed by impairments and related symptoms, such as pain, that affect only the claimant's ability to meet the demands of jobs other than the strength demands. 20 C.F.R. §§ 404.1569a(c), 416.969a(c).

consultation with a vocational expert, nor does it preclude reliance on the Guidelines.

*Bapp v. Bowen*, 802 F.2d at 603. The requirement for a vocational expert is triggered when a nonexertional impairment causes an "additional loss of work capacity beyond a negligible one or, in other words, one that so narrows a claimant's possible range of work as to deprive him of a meaningful employment opportunity." *Id.* at 605-06. The appropriateness of applying the Grids and the necessity for expert testimony must be determined on a case-by-base basis. *Id.* at 605.

## B.    Application

In this case, plaintiff first argues that the ALJ's errors in determining RFC and evaluating credibility taint his step five determination. (Pl.'s Br. at 22). Because this court has found that the ALJ's RFC and credibility findings were supported by substantial evidence, plaintiff's first argument cannot succeed.

Plaintiff also argues that plaintiff's non-exertional impairment of "borderline intellectual functioning" was significant enough to require the ALJ to call a VE to testify as to whether plaintiff could engage in any substantial gainful activity. (Pl.'s Br. at 22). In the ALJ's RFC discussion, he cited the report of consultative psychologist, Kristen Barry, Ph.D. (T. 289). On February 1, 2010, Dr. Barry found that plaintiff could follow and understand simple directions and instructions and maintain her attention and concentration fairly well. (T. 199).

Plaintiff had mild learning delays, and she was functioning in the borderline range of intelligence. Plaintiff denied any significant psychiatric symptomatology, and stated that although she had a "history" of depression, it was diagnosed when she was

involved in an abusive relationship. (T. 200). At the time of Dr. Barry's evaluation, plaintiff stated that she was "doing much better now and [had] a very supportive boyfriend." (*Id.*) Plaintiff told Dr. Barry that she could dress, bathe, and groom herself. (T. 199). She stated that she could do some cooking, cleaning, and laundry, but it depended on how she felt and her pain level on any particular day. (T. 199). Dr. Barry stated that the "claimant's allegations are not found to be consistent with the examination results." (*Id.*)

The ALJ took plaintiff's limitations into consideration when he was evaluating step five.[19] (T. 288, 290). Although the ALJ found that due to her intellectual limitations, she could perform "less than the full range of light work," he determined that a VE was not necessary because the SSRs provided "sufficient guidance" for determining whether there were a significant number of jobs available that plaintiff could perform. (T. 290). The ALJ cited SSR 85-15 which provides that as long as the plaintiff can perform the basic mental demands of competitive, remunerative, unskilled work, the individual will be found to be not disabled. Because the plaintiff had no significant limitation in her ability to perform the basic mental demands of work, based upon Dr. Barry's report, a finding of not disabled was appropriate under the framework of the Grids.

The ALJ's determination is supported by substantial evidence. Plaintiff's counsel selects portions of Dr. Barry's report which he believes show that plaintiff had

---

[19] In fact, as stated above, the ALJ found that plaintiff's intellectual limitations prevented her from performing her past light work due to the skill level involved.

a more substantial intellectual impairment, but Dr. Barry's conclusions are consistent with the ALJ's finding. There is no question that plaintiff may be intellectually limited, but those limitations do not prevent her from performing the basis mental demands of unskilled work as listed in SSR 85-15.

**WHEREFORE**, based on the findings above, it is

**RECOMMENDED**, that the Commissioner's determination be **AFFIRMED** and the plaintiff's complaint be **DISMISSED**.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have 14 days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN 14 DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing *Small v. Secretary of Health and Human Services*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72, 6(a), 6(e).

Dated: February 9, 2016

**Hon. Andrew T. Baxter**
**U.S. Magistrate Judge**